## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

The Grand Traverse Band of Ottawa
and Chippewa Indians, and its
Employee Welfare Plan,                          Case No. 14-11349

                            Plaintiffs,        Judith E. Levy
                                          United States District Judge

v.
                                          Mag. Judge Curtis Ivy, Jr.

Blue Cross Blue Shield of Michigan,

                            Defendant/Third-
                            Party Plaintiff,

v.

Munson Medical Center,

                            Third-Party
                            Defendant.

_____/

## ORDER GRANTING DEFENDANT BCBSM'S MOTION FOR PARTIAL SUMMARY JUDGMENT [154], DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [155], AND GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE A RESPONSE TO DEFENDANT BCBSM'S SUPPLEMENTAL REPLY BRIEF IN FURTHER SUPPORT OF <u>ITS MOTION FOR PARTIAL SUMMARY JUDGMENT [184]</u>

Before the Court are cross motions for partial summary judgment. (ECF Nos. 154–155.) Plaintiffs, the Grand Traverse Band of Ottawa and Chippewa Indians ("the Tribe") and its Employee Welfare Plan ("the Plan") allege that Defendant Blue Cross Blue Shield of Michigan ("BCBSM"), the Plan administrator, is liable for violations of Michigan's Health Care False Claims Act ("HCFCA"), Mich. Comp. Laws § 752.1001 *et seq.* Each contend that summary judgment is proper regarding Plaintiffs' HCFCA claim only.

For the reasons set forth below, Defendant BCBSM's motion for partial summary judgment (ECF No. 154) is granted and Plaintiffs' motion for partial summary judgment (ECF No. 155) is denied. The Court also grants Plaintiffs' motion for leave to file a response to Defendant BCBSM's supplemental reply brief in further support of its motion for partial summary judgment. (ECF No. 184.)

## I.   Background

The Court has extensively summarized the factual background of the underlying claims in previous opinions. (*See* ECF Nos. 99, 122.) For clarity, updates to the case's procedural history are included below.

After the Sixth Circuit's decision in *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.,* 748 F. App'x 12, 19 (6th Cir. 2018), the parties agreed to reinstate Plaintiffs' claims for violations of the HCFCA and breach of common law fiduciary duty as to Group #01020, the non-employee Tribe members. (ECF No. 116.) Defendant BCBSM filed a motion to dismiss Plaintiffs' state law claims regarding BCBSM's administration of the Plan as to the nonemployee group. (ECF No. 117.)

On May 20, 2019, the Court granted in part and denied in part Defendant BCBSM's motion to dismiss. (ECF No. 122.) First, the Court denied Defendant BCBSM's motion to dismiss Plaintiffs' claim under the HCFCA. (*Id.* at PageID.3262.) Then, the Court granted Defendant BCBSM's motion to dismiss the common law breach of fiduciary duty claim. (*Id.* at PageID.2274.) Defendant BCBSM filed a motion for reconsideration on the HCFCA claim, or in the alternative, for certification to the Michigan Supreme Court, or as another alternative, for certification to the United States Court of Appeals for the Sixth Circuit. (ECF No. 123.) The motions for certification were denied (ECF No. 126), and the motion for reconsideration was denied. (ECF No. 129.)

3

The only claims remaining in the operative complaint are Plaintiffs' claims for breach of the Facility Claims Process Agreement ("FCPA") as well as for violation of the HCFCA, with each claim only relating to Group #01020.

On May 21, 2021, Plaintiffs and Defendant BCBSM filed cross motions for partial summary judgment, both respectively concerning the HCFCA claim only. (ECF Nos. 154–155.) These motions are fully briefed. (ECF Nos. 154–157, 164–165, 167–168, 182, 184.)

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

4

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

Plaintiffs and Defendant BCBSM propose differing interpretations of the HCFCA claim. Plaintiffs' motion for partial summary judgment suggests that the relevant question for the Court is whether Defendant BCBSM presented a false claim by misrepresenting that Plaintiffs were receiving the better of Medicare-Like Rates ("MLR") or Defendant BCBSM's contractual rates, considering Plaintiffs' entitlement to MLR on MLR-eligible claims based on the MLR regulations. In contrast, Defendant BCBSM argues that the HCFCA claim as stated requires the Court to determine whether Defendant BCBSM presented a false statement under the meaning of the HCFCA by submitting claims that were not at MLR for payment.

Consideration of the HCFCA claim as articulated in Plaintiffs' first amended complaint (hereinafter, "the complaint"), in tandem with the

5

heightened pleading requirement for HCFCA claims, reveals that Defendant BCBSM is correct. Furthermore, because Plaintiffs have failed to demonstrate that Defendant BCBSM is bound by—and thus in violation of—the MLR regulations at issue, Defendant BCBSM is entitled to summary judgment on the HCFCA claim.

## A. The HCFCA

Michigan's HCFCA provides a cause of action for bringing false claims:

> [A] person who knowingly presents or causes to be presented a claim which contains a false statement, shall be liable to the health care corporation or health care insurer for the full amount of the benefit or payment made.

Mich. Comp. Laws § 752.1009; *see also State ex rel. Gurganus v. CVS Caremark Corp.*, No. 299997 *et al.*, 2013 WL 238552, at *8 (Mich. Ct. App. Jan. 22, 2013) (finding that "[Mich. Comp. Laws] 752.1009 creates a private cause of action for health care corporations and health care insurers.") (reversed on other grounds).

A "claim" under the HCFCA is "any attempt to cause a health care corporation or health care insurer to make the payment of a health care benefit." Mich. Comp. Laws § 751.1002(a). This Court has previously

6

determined that "[P]laintiffs are health care insurers within the meaning of the HCFCA and have statutory standing." (ECF No. 122, PageID.3262.) "'False' means wholly or partially untrue or deceptive." Mich. Comp. Laws § 752.1002(c). "'Deceptive' means making a claim to a health care corporation or health care insurer which contains a statement of fact or which fails to reveal a material fact, which statement or failure leads the health care corporation or health care insurer to believe the represented or suggested state of affair to be other than it actually is." Mich. Comp. Laws § 752.1002(b). "'Health care benefit' means the right under a contract or a certificate or policy of insurance to have a payment made by a health care corporation or health care insurer for a specified health care service." Mich. Comp. Laws § 752.1002(d).

There is little Michigan precedent analyzing this private cause of action under the HCFCA: (1) *Gurganus*, 2013 WL 238552 at *10, in which the Michigan Court of Appeals found that Mich. Comp. Laws § 752.1009 creates a private cause of action for health care corporations and health care insurers under the HCFCA; and (2) *State ex rel. Gurganus v. CVS Caremark Corp.*, 496 Mich. 45 (2014), in which the Michigan Supreme Court reversed the Michigan Court of Appeals' finding that the plaintiffs

7

alleged sufficient facts regarding an alleged violation of a provision of Michigan's Public Health Code in order to sustain a derivative HCFCA claim under Mich. Comp. Laws § 752.1009.

When analyzing Mich. Comp. Laws § 752.1009, Michigan courts have looked to the federal False Claims Act ("FCA"), stating that the FCA[1] is "analogous to the . . . HCFCA." *Gurganus*, 2013 WL 238552 at *10, *rev'd on other grounds*, 496 Mich. at 45; *see also Gurganus*, 496 Mich. at 73–4 (Cavanaugh, J., concurring) (applying the FCA's heightened pleading requirements to an HCFCA claim). However, Michigan courts have not considered the FCA to be analogous in all respects. Indeed, while *Gurganus*, 496 Mich. at 45 did not analyze this particular issue, the Michigan Court of Appeals explicitly declined to follow federal FCA precedent on the issue of how to demonstrate a "false claim" under the HCFCA when the underlying falsehood was premised on a violation of a separate statutory provision. *Gurganus*, No. 299997, 2013 WL 238552, at *14 ("In support of their argument that violation of [the underlying

---

[1] "To establish a claim under the FCA, a plaintiff must allege that (i) the defendant presented a claim of payment to the government, (ii) the claim was false or fraudulent, (iii) the defendant knew it was false or fraudulent, and (iv) the false claim was material to the government's payment." *United States v. Wal-Mart Stores E., LP*, No. 20-2128, 2021 WL 2287488, at *2 (6th Cir. June 4, 2021).

Michigan Public Health Code provision Mich. Comp. Laws §
333.17755(2)] does not constitute a 'false claim,' defendants also rely on
federal law interpreting the FCA. We find the law relied upon by
defendants distinguishable because it does not address any statute, rule,
or regulation that is analogous to § 17755(2); accordingly, we decline to
follow it under the circumstances present in this case. *See Truel[ v. City
of Dearborn*], 291 Mich. App [125,] 136 n 3 [(2010)] (decisions of lower
federal courts are not binding upon this Court).").

## B. Plaintiffs' specific HCFCA claim as outlined in the operative complaint

As a preliminary, but essential, matter, the Court must determine
the confines of Plaintiffs' HCFCA claim. The parties disagree on the
nature of this claim: specifically, why the amount charged by Defendant
BCBSM for paying the claims was "false" under Mich. Comp. Laws §
752.1009. Defendant BCBSM quotes the complaint's allegation that the
amount charged was purportedly false "because Plaintiffs were not
required to pay more than [MLR] on a number of claims administered by
BCBSM[.]" (*See* ECF No. 167, PageID.5358.) In contrast, Plaintiffs argue
in their response to Defendant BCBSM's motion for partial summary
judgment, and in Plaintiffs' own motion for partial summary judgment,

9

that "[b]ecause of [BCBSM's] false representations, the amounts charged by BCBSM for paying the claims was false. Further, Plaintiffs were not required to pay more than [MLR] on a number of claims administered by BCBSM." (*See* ECF No. 164, PageID.4996.)

Additionally, a heightened pleading standard unquestionably applies to Plaintiffs' HCFCA claim.[2] "Whether a state-law claim sounds in fraud, and so triggers [Federal Rule of Civil Procedure] 9(b)'s heightened standard, is a matter of substantive state law, on which we must defer to the state courts." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012), citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Michigan courts have determined that a plaintiff must meet a heightened pleading standard for fraud claims (i.e., Mich. Court Rule 2.112(B)(1)) to plead a claim under the HCFCA. *See, e.g., Gurganus*, 496 Mich. at 73–74 (Cavanaugh, J., concurring); *Gurganus*, No. 299997, 2013 WL 238552, at *10–11.

---

[2] Plaintiffs agreed that there is a heightened pleading standard for HCFCA claims at the hearing on Plaintiffs' motion for partial summary judgment and Defendant BCBSM's motion for partial summary judgment held on September 20, 2021. (ECF No. 189, PageID.5809.)

"Rule 9(b) provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 771 (6th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)). "Rule 9(b)'s particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Id.* (internal citation and quotation marks omitted). "To plead fraud with particularity, the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (internal citation and quotation marks omitted).

Defendant BCBSM does not seek dismissal or summary judgment based on alleged non-compliance with the heightened pleading standard of Rule 9(b). Rather, Defendant BCBSM contends that Plaintiffs pled the HCFCA claim with requisite particularity, but that Plaintiffs' characterization of their HCFCA claim at the summary judgment stage

11

does not match the HCFCA claim as pleaded in the complaint. (*See* ECF No. 165, PageID.5233–5235.) In essence, "[t]he problem is that Plaintiffs seek summary judgment on a claim they never pled, much less with particularity." (*Id.* at PageID.5234.) Plaintiffs disagree.[3]

The HCFCA count of Plaintiffs' complaint states:

## COUNT II: HEALTH CARE FALSE CLAIMS ACT

71. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

72. Plaintiffs are health care insurers as defined by [Mich. Comp. Laws] § 752.1009.

73. Plaintiffs reimbursed BCBSM for health care services it paid on behalf of [the Tribe]'s employees, citizens, and dependents.

---

[3] Plaintiffs assert without explanation that they are "the master of [their] complaint," *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007) such that Plaintiffs' description of its HCFCA claim controls. (*See* ECF No. 164, PageID.4997.) But this is a mischaracterization of this common phrase. A plaintiff's status as master of its complaint does not mean that it can unilaterally declare an interpretation of what their complaint must mean despite the complaint's plain language. Rather, this refers to the plaintiff's responsibility for the allegations ultimately included in the complaint. *See, e.g., Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 312 (6th Cir. 2009) (noting the plaintiff had a choice as to what allegations to include in his complaint and under what methods to proceed under as he was the master of the complaint); *NicSand*, 507 F.3d at 458 (refusing to reverse the plaintiff's earlier concession that it was not bringing a predatory-pricing claim under the theory that the plaintiff was the master of its complaint); *Medlen v. Estate of Meyers*, 273 F.App'x 464, 466 (6th Cir. 2008) ("because a plaintiff is the master of his complaint, he can generally choose to avoid federal jurisdiction by asserting only state law claims."). Accordingly, this Court need not "accept [Plaintiffs'] description of its HCFCA claim" without engaging in an analysis of the complaint itself. (ECF No. 164, PageID.4997.)

74. The amount charged by BCBSM for paying the claims was false because Plaintiffs were not required to pay more than [MLR] on a number of claims administered by BCBSM. The amount charged by BCBSM for stop loss insurance and administrative compensation also was false because they were based on false claims amounts.

75. In doing so, BCBSM knowingly presented or caused to be presented claims which contained one or more false statements in violation of [Mich. Comp. Laws] § 752.1009.

76. BCBSM is therefore liable to Plaintiffs for the full amount of the payments made pursuant to [Mich. Comp. Laws] § 752.1009.

77. BCBSM fraudulently concealed the foregoing wrongful conduct.

78. Plaintiffs did not discover the full extent of BCBSM's violation of [Mich. Comp. Laws] § 752.1009 until 2013.

(ECF No. 90, PageID.2556.) Review of this language confirms that Plaintiffs' characterization of their HCFCA claim on summary judgment diverges from the complaint. The HCFCA claim as pled is clearly premised upon the contention that the false statement contemplated under Mich. Comp. Laws § 752.1009 was based on Plaintiffs' entitlement to MLR on MLR-eligible claims administered by BCBSM: "The amount charged by BCBSM for paying the claims was false because Plaintiffs were not required to pay more than [MLR] on a number of claims administered by BCBSM." (*Id.*)

13

Nor does consideration of the remainder of the complaint indicate otherwise, despite Plaintiffs' arguments to the contrary. (*See* ECF No. 168, PageID.5392–5393.) Plaintiffs highlight portions of the complaint's broader factual allegations that contend Defendant BCBSM "false[ly]" represented to Plaintiffs that they would provide amounts "close to" the MLR via the FCPA Discount. (*Id.* at PageID.5392; *see also* ECF No. 90, PageID.2552.) Yet Plaintiffs ignore the broader context of the other claims initially brought in the complaint. Reference to Defendant BCBSM's false representations regarding the FCPA Discount were made in the context of the negotiations surrounding the agreement to form the FCPA as well as the concealment of the true nature of the rates as charged. (ECF No. 90, PageID.2552–2554.) This was, in turn, used to support Plaintiffs' breach of contract, fraud, and silent fraud claims. (*Id.* at PageID.2558–2560.) Comparing Plaintiffs' averments in support of the HCFCA and fraud claims is instructive: Plaintiffs' averments in support of the separate common law fraud claim indicate that BCBSM made "false" "material misrepresentations of fact to Plaintiffs, namely that the Prospective Differential [FCPA Discount] was 'close to' the [MLR] discounts available to Plaintiffs." (*Id.* at PageID.2558.) Nevertheless,

14

Plaintiffs chose not to include similar averments in their pleaded HCFCA claim, instead constructing the legal theory of falsehood to be based on failure to pay MLR on eligible claims. The distinction matters.

Plaintiffs attempt to counter Defendant BCBSM's contention through reference to the Sixth Circuit's discussion as to federal pleading under Rule 8(a)(2) and when prejudicial variance should prevent recovery found in *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). (ECF No. 168, PageID.5391–5394.) The ultimate inquiry posed by the Sixth Circuit in *Sierra Brokerage*, which stemmed from the Sixth Circuit's earlier decision in *Colonial Refrigerated Transp., Inc. v. Worsham*, 705 F.2d 821, 825 (6th Cir. 1983),[4] was to evaluate whether the change in argument made by a party would cause a "shift in the thrust of the case" that would prejudice the other party. *Sierra Brokerage*, 712 F.3d at 327. In *Colonial Refrigerated Transp.*, there was no surprise or unfair prejudice to the defendant in awarding judgment on a theory of implied indemnity despite the pleadings' assertion of a claim

---

[4] As a note, most of the cases stemming from *Colonial Refrigerated* consider the separate question of when a court can grant relief to which a party is entitled, even if not demanded in the pleadings, under Federal Rule of Civil Procedure 54. *See, e.g., Yoder v. Univ. of Louisville*, 417 F. App'x 529, 530 (6th Cir. 2011); *Bluegrass Ctr., LLC v. U.S. Intec, Inc.*, 49 F. App'x 25, 31 (6th Cir. 2002).

15

under an express indemnity provision where the complaint alleged facts that would support a claim on a theory of implied indemnity. 705 F.2d at 825. Similarly, in *Sierra Brokerage*, the Sixth Circuit found that the plaintiff had alerted the defendant to the legal and factual bases for his liability by (1) listing the explicit statutory provisions of the Securities Act under which the defendant was allegedly liable, and by (2) adequately identifying the "underlying factual issue" (i.e., the defendant's relationship to the shareholders) despite originally naming the shareholders as nominees and later as real holders of stock. *Sierra Brokerage*, 712 F.3d at 328.

According to Plaintiffs, as in *Sierra Brokerage*, the complaint here gave Defendant BCBSM "ample notice of the nature and basis for Plaintiffs' HCFCA claim[,]" such that there was no prejudice to Defendant BCBSM. (ECF No. 168, PageID.5392.) Plaintiffs also note occurrences external to the complaint itself (i.e., statements made by Plaintiffs' counsel at the June 7, 2017 hearing, questions asked by Defendant BCBSM's counsel during depositions at the discovery stage) as further evidence that Defendant BCBSM "knew its oral

misrepresentations of its network rates vis-à-vis MLR were the subject of Plaintiffs' HCFCA claim." (*Id.* at PageID.5393.)

Plaintiffs overstate the degree to which *Sierra Brokerage* controls the issue before the Court. Notably, because *Sierra Brokerage* explicitly involved the plaintiff's effective conversion of "a 'fraud-based' claim in its complaint to a 'non-fraud-based' claim in its motion for summary judgment," 712 F.3d at 327, there was no consideration of how Rule 9(b) affects a court's determination of whether there has been a shift in the thrust of the case or prejudice to the other party. Instead, the Sixth Circuit relied on *Colonial Refrigerated*, 705 F.2d at 821, as a framework for understanding whether a party has provided fair notice of the nature and basis or grounds for a claim at the pleading stage under Rule 8(a)(2). *Sierra Brokerage*, 712 F.3d at 327. Of course, Rules 8 and 9(b) are not mutually exclusive: "Rule 8 supplies both allowances and constraints that must inform a proper understanding of what Rule 9(b) requires; one cannot focus exclusively on the fact that Rule 9(b) requires particularity in pleading the circumstances of fraud without taking account of the general simplicity and flexibility contemplated by the federal rules, as well as the strictures of plausibility pleading." 5 Charles A. Wright &

Arthur R. Miller, Federal Practice and Procedure § 1298 Pleading Fraud With Particularity—Extent of Requirement, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.). Yet Rule 9(b) sets forth particularity requirements with the purpose of "alerting defendants to the precise misconduct with which they are charged[.]" *Prather*, 838 F.3d at 771. To ignore the implications of Rule 9(b)'s requirements for fraud-based claims at the summary judgment stage would effectively bypass its purpose as a means of affording a defendant a more specific form of notice of the precise misconduct at issue as compared to non-fraud-based claims.

Regardless, even assuming that the tenets of *Sierra Brokerage* apply to the fraud-based HCFCA claim at issue here, the Court nevertheless finds that Defendant BCBSM was prejudiced by the shift in the thrust of the case. *Sierra Brokerage*, 712 F.3d at 327. Plaintiffs did indeed list the same portion of the HCFCA in their pleadings—Mich. Comp. Laws § 752.1009—under which they continue to assert liability at the summary judgment stage. However, Plaintiffs' complaint did not alert Defendant BCBSM as to the *factual* bases for liability under the HCFCA claim as required under *Sierra Brokerage*. *Sierra Brokerage* concluded that there was no prejudice to the defendant because the

18

plaintiff's shift in argument at the summary judgment stage only concerned whether the shareholders were to be labeled as nominees or real owners; ultimately, the pertinent factual question at all times remained steady (i.e., "how to characterize [the defendant's] relationship to the shareholders"). 712 F.3d at 328. That is not the case here. The fundamental factual question between Plaintiffs' characterization of the HCFCA claim on summary judgment and as presented in the complaint differs: (1) Plaintiffs' newly articulated version requires answering whether Defendant BCBSM made misrepresentations as to whether Plaintiffs were receiving the better of MLR or the contractual rates, in light of Plaintiffs' entitlement to MLR; as compared to (2) the complaint's consideration of whether Defendant BCBSM submitted claims that were not at the MLR for payment. Furthermore, Defendant BCBSM was prejudiced by the distinction, ultimately filing a motion for partial summary judgment regarding the HCFCA claim as pleaded in the complaint. (ECF No. 165, PageID.5237–5238.)

Plaintiffs "cannot amend [their] complaint, which is the operative pleading in this matter, by simply including new factual allegations in [their] briefing in opposition to the motions for summary judgment."

19

*Hubbard v. Select Portfolio Servicing, Inc.*, No. 16-CV-11455, 2017 WL 3725475, at *3 (E.D. Mich. Aug. 30, 2017), *aff'd*, 736 F. App'x 590 (6th Cir. 2018). Furthermore, the Sixth Circuit "has held repeatedly[ that] a plaintiff seeking to expand her claims to assert new theories [] may not do so in response to summary judgment or on appeal." *Alexander v. Carter for Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018) (internal citation and brackets omitted). Accordingly, the Court will not permit Plaintiffs to advance this new theory of liability on summary judgment and will evaluate Plaintiffs' HCFCA claim as articulated in the complaint.

### C. Plaintiffs' derivative HCFCA claim is premised on regulations that do not apply to Defendant BCBSM

Plaintiffs' HCFCA claim is premised upon an alleged failure to follow a separate law or regulation. (*See* ECF No. 90, PageID.2540, 2556.) As set forth in previous opinions (ECF No. 122, PageID.3251), the regulations at issue are those codified at 42 C.F.R. §§ 136.30–136.32, which the parties refer to as the "MLR regulations." These regulations provide that "[a]ll Medicare-participating hospitals . . . must accept no more than the rates of payment under the methodology described in this section as payment in full for all terms and services authorized by [Indian Health Service], Tribal, and urban Indian organization entities," and

20

even if the parties had negotiated different rates, tribes would "pay the lesser of" the amount determined by the methodology and the negotiated amount. 42 C.F.R. §§ 136.30(a), (f).

According to Defendant BCBSM, it cannot be held liable for any alleged violation of the MLR regulations because the MLR regulations do not govern Defendant BCBSM directly. (*See* ECF No. 154, PageID.3793–3797.) Because the HCFCA claim as articulated requires a finding that BCBSM has violated the MLR regulations such that Plaintiffs could sustain a derivative violation of the HCFCA, the argument goes, Defendant BCBSM is entitled to summary judgment on the HCFCA claim. (*Id*.) This conceptualization of derivative liability under the HCFCA was described in *Gurganus* and ultimately was fatal to the plaintiffs' HCFCA claim: The plaintiffs contended that the defendants made false statements when submitting claims for reimbursement not in compliance with a state statute but failed to allege sufficient facts to state a violation of the state statute from which liability was to derive. 496 Mich. at 57; *see also id*. at 52 ("Whether relief is sought for violation of [the particular state statute at issue] itself, or through violation[] of the HCFCA . . . , [that same state statute] is the basis from which all of

21

plaintiffs' claims derive. In order to properly evaluate whether plaintiffs' allegations pass muster to survive summary disposition, we must first construe [that same state statute] to determine what a plaintiff must allege to sufficiently state a violation.").

Plaintiffs do not appear to disagree with Defendant BCBSM's contention that they need to first establish that Defendant BCBSM violated the MLR regulations for Plaintiffs' HCFCA claim to survive summary judgment; instead, they argue that the MLR regulations "plainly show they govern BCBSM's payment of healthcare claims using tribal funds." (ECF No. 164, PageID.5000–5001.) Accordingly, the parties differ on whether they consider the MLR regulations to govern Defendant BCBSM directly.

According to Defendant BCBSM, the MLR regulations do not impose any obligations on Defendant BCBSM, but rather, govern Medicare-participating hospitals. (ECF No. 154, PageID.3796.) Defendant BCBSM points to 42 C.F.R. § 136.30(a), which sets the scope of the MLR regulations,[5] and the Sixth Circuit's consideration of that

---

[5] 42 C.F.R. § 136.30(a) states:

regulation as it related to a fiduciary duty under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. § 1001 *et seq.* in *Saginaw Chippewa*, 748 F. App'x at 20,[6] to support this contention. Additionally, "[t]he regulation [specifically, in 42 C.F.R. § 136.32] also provided a mechanism for Indian organizations to recover from hospitals that did not apply the required MLR rates." *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 477 F. Supp. 3d 598, 606–07 (E.D. Mich. 2020). Plaintiffs appear to have used this same legal mechanism to recover some overpayments directly from hospitals pursuant to that process. (ECF No. 154, PageID.3796.) Under BCBSM's

---

"(a) Scope. All Medicare-participating hospitals, which are defined for purposes of this subpart to include all departments and provider-based facilities of hospitals (as defined in sections 1861(e) and (f) of the Social Security Act) and critical access hospitals (as defined in section 1861(mm)(1) of the Social Security Act), that furnish inpatient services must accept no more than the rates of payment under the methodology described in this section as payment in full for all items and services authorized by IHS, Tribal, and urban Indian organization entities, as described in paragraph (b) of this section."

[6] "The Tribe bases its MLR claim on 42 C.F.R. § 136.30, which requires Medicare-participating hospitals to accept payment for services at a rate that is no more than what those services would cost under Medicare, provided that the services are authorized by a Tribe that is carrying out a Contract Health Service ("CHS") program on behalf of the Indian Health Service ("IHS")." *Saginaw Chippewa*, 748 F. App'x at 20.

logic, BCBSM was a third-party administrator ("TPA") and was thus not subject to these MLR regulations; because Plaintiffs' breach of fiduciary duty claim has been dismissed, there is no means by which Plaintiffs can recover from BCBSM for the fact that "BCBSM *should have* done something more" to ensure that Plaintiffs were paying the amount they were entitled to under the MLR regulations. (*Id*. at PageID.3798.) Instead, the proper vehicle for any overpayments in relation to the MLR regulations are suits under 42 C.F.R. § 136.32 against Medicare-participating hospitals, directly.

Plaintiffs disagree. They contend that Defendant BCBSM is improperly focusing on only one snippet of the MLR regulations despite the existence of other subsections that plainly govern Defendant BCBSM's payment of healthcare claims with tribal funds. (ECF No. 164, PageID.5000–5002.) According to Plaintiffs, 42 C.F.R 136.30(a) outlines the separate requirement for Medicare-participating hospitals to accept the MLR regulation's payment rates. However, other subsections allegedly also require Defendant BCBSM to pay at MLR or its contractual rate (if lower). In support, Plaintiffs highlight the title of 42 C.F.R. § 136.30 (i.e., "Payment to Medicare-participating hospitals for

authorized Contract Health Services"); the provisions outlining the required payment rates as in line with what the Medicare program would pay under a prospective payment system (*see* 42 C.F.R. §§ 136.30(c)-(e)); as well as the exception to this payment calculation for negotiated-rates with hospitals (*see* 42 C.F.R. § 136.30(f)). Putting all these together, Plaintiffs argue, "the MLR regulations require that BCBSM ensure '[t]he [Tribe's] payment will not exceed' MLR 'or the contracted amount (plus applicable cost sharing), whichever is less[.]' 42 C.F.R 136.30(g)(4)." (*Id.* at PageID.5000–5001.) Plaintiffs frame Defendant BCBSM's argument as one in which Defendant BCBSM allegedly argues that they are "exempt" from complying with the MLR regulations. (*Id.* at PageID.5001.) Yet, Plaintiffs say, the Department of Health and Human Services ("DHHS") could have expressly indicated that TPAs were exempted if it indeed wanted to exempt them from these provisions. (*Id.*) And, finally, Plaintiffs point to internal BCBSM communications to suggest that Defendant BCBSM felt that it was required to comply with those regulations. (*Id.*)

While Plaintiffs are correct (ECF No. 164, PageID.5002) that the Court has previously recognized that these MLR regulations "directly

affect how [BCBSM] administers and manages plan assets" (ECF No. 99, PageID.2933), they stretch this line beyond its intended meaning. The Court has not found through the course of this litigation that the MLR regulations *govern* Defendant BCBSM, but rather, that these MLR regulations necessarily *affect* Defendant BCBSM's management of the Plan: "42 U.S.C. § 1395cc require[s] Medicare-participating hospitals that agree to provide medical care 'under the contract health services program funded by the Indian Health Service [("IHS")] and operated by the [IHS], an Indian tribe, or tribal organization' to accept [MLR] as payment." *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 32 F.4th 548, 554 (6th Cir. 2022) (quoting 42 U.S.C. § 1395cc(a)(1)(U)(i). In turn, 42 C.F.R. § 136.30 "sets a ceiling on payments that Medicare-participating hospitals receive for [Contract Health Service ("CHS")] care 'authorized by IHS, Tribal, and urban Indian organization entities.'" *Id.* (quoting 42 C.F.R. § 136.30(a)). The relevant question, then, is whether the MLR regulations are limited to apply only to Medicare-participating hospitals, to the extent that the payment ceiling is implemented by requiring those hospitals to accept a

certain level of payment that complies with the rates set in the regulations.

The parties did not present any precedent on this subject, nor did the Court uncover relevant caselaw through its own research. Furthermore, Plaintiffs' attempt to use contemporary communications internal to Defendant BCBSM in support of the argument that Defendant BCBSM is governed by the MLR regulations is unavailing. Because HCFCA liability depends on whether Defendant BCBSM violated the MLR regulations, what matters here is what the regulations require—not how Defendant BCBSM interpreted them at the time. Accordingly, the Court must engage in regulatory interpretation of 42 C.F.R. § 136.30.

The Sixth Circuit recently summarized the framework by which to engage in regulatory interpretation in the context of evaluating the same disputed regulatory language, albeit to answer a different question than that currently before the Court:

> [C]ourts "begin [their] interpretation of the regulation with its text." *Green v. Brennan*, 578 U.S. 547[, 553] (2016). "[A] fundamental canon of statutory construction is that 'when interpreting statutes, the language of the statute is the starting

27

point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.'" *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007) (quoting *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001)). The same logic applies to interpretation of regulatory language. *See Kisor v. Wilkie*, —— U.S. ——, [] (2019). We therefore deploy the standard tools of interpretation. *See, e.g., Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 688–69[] (2007) (invoking the canon against surplusage in the interpretation of regulatory language); *Long Island Care Home, Ltd. v. Coke*, 551 U.S. 158, 170[] (2007) (using the canon that the specific controls the general in construing regulatory language). If a regulation's meaning is plain, the court must give the [sic] "it effect, as the court would any law," *Kisor*, 139 S. Ct. at 2415, and the court's inquiry into the regulatory meaning is over, *In re Laurain*, 113 F.3d 595, 597 (6th Cir. 1997); *cf. Bostock v. Clayton Cnty.*, —— U.S. ——[] (2020). We may look to agency guidance if the language is ambiguous, but typically, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Kisor*, 139 S. Ct. at 2415 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9[] (1984)).

*Saginaw Chippewa*, 32 F.4th at 557–58.

A review of the text of 42 C.F.R. § 136.30 in its entirety clearly and unambiguously sets forth a regime by which Medicare-participating hospitals—and only those entities—must accept MLR as payment for qualifying care.[7] The explicit regulatory scope subsection is hardly

---

[7] Indeed, although the Sixth Circuit in *Saginaw Chippewa*, 32 F.4th 558–63, analyzed § 136.30 to determine the separate question of "whether Medicare-like rates

ambiguous: "Medicare-participating hospitals" are the only entity referenced. *Id.* § 136.30(a). Specifically, Section 130(a) does not mention TPAs or claims administrators generally, but instead requires Medicare-participating hospitals *to accept* payments that match this regulatory scheme. *Id.* § 136.30(a). The remaining sections highlighted by Plaintiffs—*id.* §§ 136.30(c)–(e)—set forth the required calculation of I/T/U[8] payment amounts to be accepted by these hospitals. *See Saginaw Chippewa*, 32 F.4th at 558–59 (citing 42 C.F.R. § 136.30(c)–(d)) ("Subsections (c) and (d) explain the reimbursement calculation in relation to the Medicare reimbursement rate. . . . [S]ubsections (e), (f), and (g), . . . discuss how MLR payments to Medicare-participating hospitals are calculated."). Similarly, the exception in § 136.30(f), which

_____

were even available for services authorized by the Tribe's CHS program and billed through the Blue Cross plans," the analysis suggested a similar conclusion as the Court finds here. *See id.* at 558 ("The disputed regulatory language concerns § 136.30, which sets a ceiling on the payments that Medicare-participating hospitals can receive for authorized CHS care."); *id.* at 560 (noting that "[t]he statutory authority on which [§ 136.30] rests . . . requires Medicare-participating hospitals to . . . accept Medicare-like rates as payment[.]").

[8] "An I/T/U is an IHS contract health service program, a 'Tribe or Tribal organization carrying out a CHS program of the IHS under the Indian Self-Determination and Education Assistance Act,' or 'an urban Indian organization.'" *Saginaw Chippewa*, 32 F.4th at 554 (citing 42 C.F.R. § 136.30(b)). Plaintiffs agreed at oral argument that Plaintiffs are an I/T/U, and that BCBSM is not. (ECF No. 189, PageID.5813.)

applies "if an amount has been negotiated with the hospital or its agent by the I/T/U,"[9] outlines that "*the I/T/U* will pay" the lesser of the MLR rate or the negotiated network rate. *Id.* § 136.30(f) (emphasis added). While the title of the MLR regulations at issue (i.e., "Payment to Medicare-participating hospitals for authorized Contract Health Services") may possibly be considered broadly to encompass payments made by non-Medicare-participating hospitals, "we need not refer to titles, which do not carry the force of law, when the statutory text is clear." *United States v. Richardson*, 948 F.3d 733, 748 (6th Cir. 2020).

---

[9] Additionally, Plaintiffs argued at oral argument that Defendant BCBSM acted as an agent of Plaintiffs when paying MLR-eligible claims on Plaintiffs' behalf, and that Defendant BCBSM thus served as an agent of an I/T/U. (ECF No. 189, PageID.5794, 5798.) Even assuming for the sake of argument that an agency relationship existed between Plaintiffs and Defendant BCBSM in this context, the regulations nevertheless do not apply to such factual circumstances. The plain text of § 136.30(f) relates explicitly to negotiations conducted between the I/T/U and the hospital or the *hospital's* agent, and not an agent of the I/T/U. *See* 42 C.F.R. § 136.30(f) ("if an amount has been negotiated with the hospital or *its agent* by the I/T/U") (emphasis added). Nor does any subsection of § 136.30 include language indicating that agents acting on behalf of an I/T/U would be responsible for a Medicare-participating hospital's failure to provide MLR for MLR-eligible claims. Furthermore, such a proposition would be contrary to the logic of agency principles, wherein "the agent stands in the shoes of the principal." *In re Est. of Capuzzi*, 470 Mich. 399, 402 (2004). Any liability against Defendant BCBSM based on an agency relationship (e.g., violation of an agent's fiduciary duty) would stem from alternate legal theories.

TPAs are never referenced in the entirety of § 136.30. There is no language in § 136.30 that indicates that textual references to I/T/U in the MLR regulations are extended to include TPAs like Defendant BCBSM (such that this creates a binding requirement on TPAs to ensure the appropriate payment is made on behalf of I/T/Us).[10] Nor is there any language clarifying that the scope set forth in § 136.30(a) should also include requirements on TPAs like Defendant BCBSM beyond the requirements for Medicare-participating hospitals. Indeed, as Defendant BCBSM notes (ECF No. 154, PageID.3796), the MLR regulations in § 136.32 provide a mechanism for tribal organizations to recover *from hospitals* that did not apply the required MLR rates; there is no affiliated mechanism for recovery from TPAs or related claims-processing entities. Were the MLR regulations in § 136.30 to implicitly include obligations on TPAs, it would be logical to expect that they would mention a mechanism

---

[10] Furthermore, I/T/Us are expressly defined in the MLR regulations. *Saginaw Chippewa*, 32 F.4th at 554 (citing 42 C.F.R. § 136.30(b)). Where statutes define a term, "that definition must govern the resolution of [the] case." *Tennessee Prot. & Advoc., Inc. v. Wells*, 371 F.3d 342, 346 (6th Cir. 2004). Nor would it logically make sense to think of TPAs as equivalent to I/T/Us within the context of the MLR framework generally, because then any burden on TPAs to ensure payments are made in line with the MLR regulations would extend to the I/T/Us themselves.

31

for recovery from TPAs directly in the event the regulations were not followed.

By the plain language of § 136.30, the MLR regulations set forth the governing framework by which Medicare-participating hospitals will pay for MLR-eligible care—without extending such obligations on other entities involved in the healthcare provision or claims process. Such clear language must thus be the ending point for analysis of the regulatory meaning. *Thompson*, 507 F.3d at 419.

For similar reasons, the Court disagrees with Plaintiffs' characterization that Defendant BCBSM is trying to exempt itself from otherwise governing MLR regulations. (ECF No. 164, PageID.5000–5002.) Plaintiffs argue—without explanation—that the "Scope" section of the MLR regulations contained in § 136.30(a) is somehow an isolated provision to be considered independently from the remainder of § 136.30. (*Id.* at PageID.5001.) Yet Plaintiffs' argument ignores the need to consider the regulation as a single unit: "Since a statute's plain meaning must be understood by looking at the language and design of the statute as a whole, we must consider the statute as a whole to clarify potential ambiguity." *Molosky v. Washington Mut., Inc.*, 664 F.3d 109, 117 (6th Cir.

2011) (internal quotation marks omitted). Additionally, Plaintiffs contend that the DHHS could have expressly indicated that TPAs were excluded from the MLR regulations. (*Id.* at PageID.5001.) Because the DHHS did not expressly indicate this, the argument goes, TPAs are not to be considered an exception. Yet this logic is backwards under the interpretive canon "*expressio unius est exclusio alterius*, expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (internal quotation marks omitted, addition in original). The DHHS' decision to exclude mention of TPAs here—in the context of an explicit mention of Medicare-participating hospitals, only—suggests that they never intended to include TPAs in the group governed by these MLR regulations in the first instance.

Ultimately, the underpinning logic of Plaintiffs' argument is that because Defendant BCBSM is involved in the payment to Medicare-participating hospitals for CHS, and that is the underlying conduct in this case, Defendant BCBSM must be beholden to the MLR regulations. But Plaintiffs' argument would require the Court to improperly impose an obligation on Defendant BCBSM that is not included in the text of §

136.30, and Plaintiffs have not pointed to another subsection of the MLR regulations or other regulatory regimes that would otherwise create a legal requirement for Defendant BCBSM to only accept MLR for claims it administered to Plaintiffs.

Under the plain language of the MLR regulations cited by the parties, these regulations impose obligations on Medicare-participating hospitals to ensure they follow a particular payment regime when billing federally recognized tribes, in order to continue participating in Medicare. These regulations do not impose a separate obligation on TPAs like Defendant BCBSM to ensure that federally recognized tribes pay MLR for MLR-eligible claims. Because Plaintiffs have failed to demonstrate that Defendant BCBSM can violate 42 C.F.R. § 136.30, this necessarily means that they have failed to allege derivative violations of the HCFCA. *See Gurganus*, 496 Mich. at 67. Accordingly, Defendant BCBSM is entitled to summary judgment on the HCFCA claim.

## IV.   Conclusion

For the reasons set forth above, the Court **GRANTS** Defendant BCBSM's motion for partial summary judgment (ECF No. 154) and **DENIES** Plaintiffs' motion for partial summary judgment (ECF No. 155).

The Court also **GRANTS** Plaintiffs' motion for leave to file a response to Defendant BCBSM's supplemental reply brief in further support of its motion for partial summary judgment. (ECF No. 184.)

IT IS SO ORDERED.

Dated: August 3, 2022           s/Judith E. Levy
Ann Arbor, Michigan         JUDITH E. LEVY
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 3, 2022.

                                     s/William Barkholz
                                     WILLIAM BARKHOLZ
                                     Case Manager